AO 91, Rev. 11/82   (NBW)

# CRIMINAL COMPLAINT

#09-241

| **United States District Court** | DISTRICT<br>Eastern District of Pennsylvania |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>DANI NEMR TARRAF<br>DOURI NEMR TARRAF<br>HASSAN MOHAMAD KOMEIHA<br>HUSSEIN ALI ASFOUR,<br>a/k/a "Alex,"<br>ALI FADEL YAHFOUFI | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>09-M-1902 |

| Complaint for violations of Title 18, United States Code §§ 2332g and 371 ||||
|---|---|---|---|

| NAME OF JUDGE OR MAGISTRATE<br><br>Honorable TIMOTHY R. RICE | | OFFICIAL TITLE<br><br>U.S. Magistrate Judge | LOCATION<br><br>Philadelphia, PA |
|---|---|---|---|
| DATE OF OFFENSE<br>From in or about January 2007 through in or about November 2009 | PLACE OF OFFENSE<br>Eastern District of Pennsylvania and elsewhere | ADDRESS OF ACCUSED (if known)<br><br>See Attachment B | |

| COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:<br><br>See Attachment A |
|---|

FILED

NOV 2 0 2009

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

| BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:<br><br>SEE AFFIDAVIT ATTACHED HERETO |
|---|

| MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED: |
|---|

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title)<br><br>Samuel Smemo, Jr. |
|---|---|
| | OFFICIAL TITLE<br>Supervisory Special Agent<br>Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence.

| SIGNATURE OF MAGISTRATE (1)<br><br>Honorable TIMOTHY R. RICE, United States Magistrate Judge | DATE<br><br>November 20, 2009 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

ATTACHMENT A

From in or about June 2007 through and including in or about November 2009, DANI NEMR TARRAF, DOURI NEMR TARRAF, HASSAN MOHAMAD KOMEIHA, and HUSSEIN ALI ASFOUR, a/k/a "Alex," conspired to transport stolen goods, in violation of Title 18, United States Code, Section 371;

From in or about March 2009 through and including in or about November 2009, DANI NEMR TARRAF conspired to acquire a missile system designed to destroy aircraft, in violation of Title 18, United States Code, Section 2332g;

From in or about March 2009 through and including in or about November 2009, DANI NEMR TARRAF conspired to possess machineguns, in violation of Title 18, United States Code, Section 371; and

From in or about September 2008 through and including in or about November 2009, DANI NEMR TARRAF and ALI FADEL YAHFOUFI conspired to commit passport fraud, in violation of Title 18, United States Code, Section 371.

ATTACHMENT B

DANI NEMR TARRAF
  Trnava, Republic of Slovakia; Lebanon

DOURI NEMR TARRAF
  Trnava, Republic of Slovakia; Lebanon

HASSAN MOHAMAD KOMEIHA
  Lebanon

HUSSEIN ALI ASFOUR,
  a/k/a "Alex,"
  100 Cross Link Trail, Centerville GA 31028

ALI FADEL YAHFOUFI
  Trnava, Republic of Slovakia; Lebanon

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR ARREST AND SEIZURE WARRANTS

I, Samuel Smemo, Jr., being duly sworn, depose and state the following:

### *Affiant's Qualifications*

1.      I am a Supervisory Special Agent with the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF"), Philadelphia Division, and have been so employed since March 2007.  From March 2004 through March 2007, I was a Supervisory Special Agent with the International Terrorism Operations Section (ITOS-1) in FBI Headquarters.  I served as a Special Agent of the FBI from August 1998 through March 2004.  From 1988 through 1998, I served with the United States Marshals Service.  I have received basic and advanced training in the areas of criminal investigation, evidence collection, and the handling of confidential human sources.  During the years assigned to the JTTF, I have investigated a variety of federal violations, including Providing Material Support to a Designated Terrorist Organization (18 U.S.C. § 2339B); Possession of Machineguns (18 U.S.C. § 922(o)); Transportation of Weapons in Interstate/Foreign Commerce (18 U.S.C. § 922(a)(4)); Acquiring Missile System Designed to Destroy Aircraft (18 U.S.C. § 2332g); Transportation of Stolen Property (18 U.S.C. § 2314); Trafficking in Counterfeit Goods (18 U.S.C. § 2320); Money Laundering (18 U.S.C. §§ 1956 & 1957); False Statements to Government Officials (18 U.S.C. § 1001); Passport Fraud (18 U.S.C. §§ 1542 & 1543); Dealing in Counterfeit Obligations (18 U.S.C. § 473); Conspiracy (18 U.S.C. § 371); and Aiding and Abetting (18 U.S.C. § 2).

### *Introduction*

2.      This affidavit is made in support of a criminal complaint and arrest warrants charging the following defendants with the following crimes:

| STATUTE | CHARGE | DEFENDANT(S) |
| --- | --- | --- |
| 18 U.S.C. § 371 | Conspiracy to Transport Stolen Property | DANI NEMR TARRAF<br>DOURI NEMR TARRAF<br>HASSAN MOHAMAD KOMEIHA<br>HUSSEIN ALI ASFOUR,<br>    a/k/a "Alex" |
| 18 U.S.C. § 2332g | Conspiracy to Acquire Missile System Designed to Destroy Aircraft | DANI NEMR TARRAF |
| 18 U.S.C. § 371 | Conspiracy to Possess Machineguns | DANI NEMR TARRAF |
| 18 U.S.C. § 371 | Conspiracy to Commit Passport Fraud | DANI NEMR TARRAF<br>ALI FADEL YAHFOUFI |

The facts set forth in this affidavit reflect my personal knowledge, information obtained during my participation in this investigation, review of documents, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein. Because this affidavit is submitted for the limited purpose of establishing probable cause, the affidavit does not set forth every fact learned during the course of this investigation.

### *Conspiracy to Transport Stolen Property — 18 U.S.C. § 371*

3.      In or about late June 2007, a law enforcement officer acting in an undercover capacity (the "UC") began receiving calls from an unidentified telephone number with a 313- area code (area including Detroit, Michigan). Eventually, the UC answered and learned that the caller was defendant HASSAN MOHAMAD KOMEIHA, who identified himself as a cousin of "S.K.," an individual to whom the UC had been selling purportedly stolen property in an undercover capacity since approximately January 2007. KOMEIHA stated that he wanted to meet to discuss doing business with the UC.

4.      On or about July 11, 2007, defendant HASSAN MOHAMAD KOMEIHA traveled to Philadelphia to meet the UC. During this meeting, the UC said that the UC could sell stolen laptop computers and Sony PlayStation 2 systems to KOMEIHA at a price below retail value.[1] Even after hearing explicit reference to the stolen nature of the goods, KOMEIHA indicated that he wanted to do business with the UC. Moreover, he noted that he only used prepaid cellular phones to call the UC and advised the UC to buy a prepaid phone only to be used to communicate with KOMEIHA. KOMEIHA expressly stated that prepaid phones provided better protection from law enforcement scrutiny.

5.      In conversations over the course of in or about July 2007, defendant HASSAN MOHAMAD KOMEIHA instructed the UC to export from Philadelphia approximately 45 purportedly stolen laptop computers to "Daniel Nemer" (defendant DANI NEMR TARRAF) at Power Express S.R.O. in Slovakia.

6.      The conspirators purchased additional, purportedly stolen electronic equipment from the UC over the course of the next few months, including:

a.      On or about October 9, 2007, defendant HASSAN MOHAMAD KOMEIHA caused the UC to export from Philadelphia approximately 50 purportedly stolen laptop computers and approximately 200 purportedly stolen Sony PlayStation 2 systems to "Daniel Nemer" (defendant DANI NEMR TARRAF) at Power Express S.R.O. in Slovakia.

b.      On or about November 19, 2007, defendant HASSAN MOHAMAD

---

[1]      Pursuant to 18 U.S.C. § 21, the term "stolen" in statutes such as 18 U.S.C. § 2314 includes items that are represented to be stolen by a government agent.

KOMEIHA caused the UC to export from Philadelphia approximately 1,000 purportedly stolen cellular telephones and approximately 300 purportedly stolen Sony PlayStation 2 systems to an address in Asunscion, Paraguay.

        c.     On or about November 26, 2007, defendant HASSAN MOHAMAD KOMEIHA caused the UC to export from Philadelphia approximately 98 purportedly stolen laptop computers to "Daniel Nemer" (defendant DANI NEMR TARRAF) at Power Express S.R.O. in Slovakia.

        7.     On or about December 26, 2007, defendant HASSAN MOHAMAD KOMEIHA brought a co-conspirator, defendant HUSSEIN ALI ASFOUR, a/k/a "Alex," to a meeting with the UC in Philadelphia.  In ASFOUR's presence, KOMEIHA told the UC that ASFOUR was the person who would take the blame for KOMEIHA, in case anything went wrong with their business dealings, because ASFOUR had less to lose than KOMEIHA.  In this meeting, ASFOUR and KOMEIHA took possession of approximately 2,000 purportedly stolen cellular telephones and caused the telephones to be transported to Detroit, Michigan.[2]

        8.     The conspirators purchased additional, purportedly stolen electronic equipment from the UC over the course of the next few months, including:

        a.     On or about January 5, 2008, in Philadelphia, the UC delivered to defendant HUSSEIN ALI ASFOUR, a/k/a "Alex" — acting on behalf of defendant HASSAN MOHAMAD KOMEIHA — approximately  900 purportedly stolen cellular telephones.  ASFOUR caused those phones to be transported from Delaware County (PA) to Los Angeles, California.

        b.     On or about January 10, 2008, in Philadelphia, the UC delivered to defendant HUSSEIN ALI ASFOUR, a/k/a "Alex" — again acting on behalf of defendant HASSAN MOHAMAD KOMEIHA — approximately 2,000 purportedly stolen cellular phones.  ASFOUR caused those phones to be transported from Delaware County (PA) to Los Angeles, California.

        c.     On or about February 6, 2008, in Philadelphia, the UC delivered to defendant HUSSEIN ALI ASFOUR, a/k/a "Alex" — again acting on behalf of defendant HASSAN MOHAMAD KOMEIHA — approximately 1,100 purportedly stolen cellular telephones.  ASFOUR caused those phones to be transported from Delaware County (PA) to Los Angeles, California.

---

     [2]     In several ways, defendant ASFOUR demonstrated his criminal knowledge and intent on or about December 26, 2007.  For instance, at one point, ASFOUR asked an undercover law enforcement officer if any surveillance cameras in the area were capable of recording their presence or connect them to the (purportedly stolen) cellular telephones.  ASFOUR also inquired about the diligence of the Philadelphia Police Department in pursuing these sort of crimes.  Finally, ASFOUR stated that, once the phones were exported [out of the United States], there was no longer a risk of getting caught.

d.       On or about February 29, 2008, defendant HASSAN MOHAMAD KOMEIHA purchased approximately 100 purportedly stolen laptop computers from the UC and instructed the UC to export those computers to Power Express S.R.O. in Slovakia. On or about that same day, in an email to both defendants KOMEIHA and HUSSEIN ALI ASFOUR, a/k/a "Alex," the UC expressly advised the defendants about the stolen nature of the UC's merchandise: "Hass you need to send that money quicker. Remember 'Ali-Baba and the 40 thieves', my thieves have to eat. You owe me some coin."

e.       On or about March 11, 2008, at the instructions of defendant HASSAN MOHAMAD KOMEIHA, the UC delivered to defendant HUSSEIN ALI ASFOUR, a/k/a "Alex," in Philadelphia approximately 1,000 purportedly stolen cellular telephones. ASFOUR caused those phones to be transported from Delaware County (PA) to Los Angeles, California.

9.       On or about April 3, 2008, defendant HASSAN MOHAMAD KOMEIHA visited the UC in Philadelphia to discuss, among other things, KOMEIHA's payments for merchandise. During that meeting, KOMEIHA replaced the SIM card in his cellular phone and placed a call to "Dani" (defendant DANI NEMR TARRAF) in Arabic. KOMEIHA handed the phone to the UC, who spoke to DANI NEMR TARRAF in English. TARRAF advised the UC that the UC would receive a $75,000 payment within the next 10 days. On or about April 23, 2008, defendants DANI NEMR TARRAF and DOURI NEMR TARRAF, on behalf of Power Express S.R.O., caused a wire transfer to be sent in the amount of approximately $74,955 to the UC's bank account.

10.       On or about May 27, 2008, in Slovakia, the UC met defendants DANI NEMR TARRAF, DOURI NEMR TARRAF, and HASSAN MOHAMAD KOMEIHA at the offices of Power Express S.R.O. During their conversations and interactions, the UC learned from defendant DANI NEMR TARRAF that, in substance, while DANI NEMR TARRAF acts as the head of Power Express S.R.O., DOURI NEMR TARRAF serves as his assistant and handles logistical matters such as payments and correspondence. In the presence of these defendants, the UC talked about, among other things, the criminal nature of the UC's business:

| | |
|---|---|
| UC: | *Dani, you got to know that all my stuff comes... I'm not a regular businessman...* |
| DANI: | *Absolutely.* |
| UC: | *All my stuff comes... it's stolen.* |
| DANI: | *Yes, yes, I know.* |
| UC: | *I bring it here, and you have to make sure you're taking care of stuff and it's not coming back to the States.* |
| DANI: | *Exactly, exactly.* |
| UC: | *OK, perfect. Alright, babe, that's all I needed to know.* |

11.       In the Slovakia meeting on or about May 27, 2008, in the presence of defendants

-4-

HASSAN MOHAMAD KOMEIHA and DOURI NEMR TARRAF, defendant DANI NEMR TARRAF asked the UC to acquire for them additional goods beyond the consumer electronic equipment that had been supplied up to that point.[3] Defendant DANI NEMR TARRAF noted that he participated in the transportation of that equipment as a favor to defendant KOMEIHA, and that his primary business was obtaining more sophisticated types of equipment. Indeed, as the conspirators discussed the types of equipment they wanted from the UC in the future, defendant DOURI NEMR TARRAF handed to the UC product specifications that he had printed from the Internet, including specifications for (1) third-generation[4] night-vision camera lenses; (2) low-light video cameras; and (3) thermal imaging devices.

12.     Also in this Slovakia meeting on or about May 27, 2008, in the presence of defendant HASSAN MOHAMAD KOMEIHA, defendants DANI NEMR TARRAF and DOURI NEMR TARRAF advised the UC to communicate with them in the future through encrypted emails.

13.     At this Slovakia meeting on or about May 27, 2008, defendant HASSAN MOHAMAD KOMEIHA made it clear to all participants that he would continue to participate in the conspiracy as a liaison between the defendants and the UC. Defendant KOMEIHA stated that he would be "in the middle all the time" and that he would be "the hidden fighter." Later, on or about June 18, 2008, defendant KOMEIHA reiterated that he was the "middleman" between the UC and the defendants,[5] and that they can't be without defendant KOMEIHA because he is their

---

[3]     The UC claimed to have contacts on United States military bases who could steal equipment.

[4]     It is my understanding that night-vision technology is classified according to "generations." First generation is the most basic, and second and third-generation connote increasingly sophisticated technology.

[5]     Defendant KOMEIHA negotiated a commission for himself on each successful transaction between the UC and the defendants. On or about October 16, 2008, defendant KOMEIHA emphasized to the UC that he had helped establish a good relationship between the UC and defendant DANI NEMR TARRAF. Defendant KOMEIHA stated that he was going to receive an unspecified commission from defendant DANI NEMR TARRAF, and he asked for a commission from the UC, as well, in payment for serving as the middleman. The UC agreed to pay defendant KOMEIHA a 5% commission on all transactions between the defendants and the UC. Thereafter, the UC and defendant KOMEIHA communicated about specific transactions on which defendant KOMEIHA would earn a commission, and, on or about September 18, 2009, the UC sent an email to defendant KOMEIHA summarizing all of the UC's transactions with the defendants on which defendant KOMEIHA had earned commissions (applied to a debt owed to the UC for unpaid, purportedly stolen electronics). This email explicitly noted the military nature of some of the items, such as "500 military radios," "1000 military compasses," and "43 night-vision cameras." Defendant KOMEIHA received this email and replied to it soon thereafter with a message about obtaining more (purportedly stolen) electronics from the UC.

-5-

"godfather."

14.     The conspirators purchased additional, purportedly stolen merchandise from the UC over the course of the next few months, including:

a.      After meeting the UC in Slovakia on or about May 27, 2008, defendants DANI NEMR TARRAF and DOURI NEMR TARRAF communicated with the UC about the UC's ability to obtain military-grade compasses for the defendants. On or about August 11, 2008, the UC exported from Philadelphia approximately 1,000 Cammenga model 27 lensatic compasses to the defendants' associates via the Beirut International Airport in Lebanon. Defendant DANI NEMR TARRAF instructed the UC to mislabel the shipment as "spare parts" on export documents. Over the course of the next week, the UC communicated with both defendants DANI NEMR TARRAF and DOURI NEMR TARRAF to confirm receipt of the compasses in Lebanon.

b.      In or about June 2008, defendants DANI NEMR TARRAF and DOURI NEMR TARRAF asked the UC to obtain for them Yaesu Model FT-60R two-way radios— a sophisticated radio which offers approximately 1,000 memory channels capable of exchanging communications between radio frequencies and fiber-optic networks. In two shipments in or about 2008, the UC exported a total of approximately 500 of these radios to the defendants' associates via the Beirut International Airport in Lebanon. For each shipment, defendant DANI NEMR TARRAF instructed the UC to mislabel the shipment as "spare parts" on export documents.

c.      On or about June 5, 2008, defendants DANI NEMR TARRAF, DOURI NEMR TARRAF, and HASSAN MOHAMAD KOMEIHA purchased approximately 200 purportedly stolen laptop computers from the UC and caused the UC to export those computers from Philadelphia to Power Express S.R.O. in Slovakia.

d.      On or about September 19, 2008, defendants DANI NEMR TARRAF and DOURI NEMR TARRAF[6] caused the UC to export approximately 95 purportedly stolen cellular telephones from Philadelphia to an address in Bahrain.

e.      In two shipments, on or about September 19, 2008 and on or about December 19, 2008, the UC exported a total of approximately 43 SunStar 300 cameras to the defendants' associates via the Beirut International Airport in Lebanon. For each shipment, defendant DANI NEMR TARRAF instructed the UC to mislabel the shipment as "spare parts" on export documents.

15.     Throughout the course of their interactions, the UC made other statements to the defendants that made it clear that the merchandise offered for sale by the UC was illegally obtained.

_____

[6]     On or about November 21, 2008, defendant DOURI NEMR TARRAF spoke with the UC in Philadelphia via telephone to report that approximately $20,000 had recently been wired to the UC in partial payment.

a.     For example, on or about December 23, 2008, when defendant DANI NEMR TARRAF requested additional, purportedly stolen cellular telephones, the UC claimed that the holiday season caused increased government inspections and scrutiny, and that the UC therefore wanted to be cautious for now.  The UC reiterated the same sentiment (1) to DOURI NEMR TARRAF in a telephone call on or about December 24th and January 11, 2009, regarding DOURI NEMR TARRAF's request for more purportedly stolen cellular telephones destined for Bahrain, and (2) to defendant DANI NEMR TARRAF in a telephone call on January 1, 2009, in response to his inquiry whether any additional merchandise had been sent.

b.     In a telephone call on or about February 25, 2009, defendant DOURI NEMR TARRAF told the UC that he (DOURI) had lined up buyers for additional, purportedly stolen cellular telephones whenever the UC could supply them.  The UC asked DOURI NEMR TARRAF if any of the buyers were aware that the UC supplied the phones or that the phones were stolen.[7] DOURI NEMR TARRAF replied that the buyers did not know that the phones were stolen, and that he (DOURI) just tells them that the phones come from the United States.

16.    On or about March 13, 2009, defendant DANI NEMR TARRAF met the UC in Philadelphia and, among other things, agreed to purchase from the UC approximately four, purportedly stolen BMW automobiles to be exported to Lebanon along with additional purportedly stolen electronics.  On or about April 11, 2009, the UC exported from Philadelphia to Lebanon approximately 100 purportedly stolen Sony PlayStation 2 systems and approximately 100 purportedly stolen cellular telephones, and on or about May 15, 2009, the UC exported those automobiles to Lebanon.

### *Anti-Aircraft Missiles & Machineguns — 18 U.S.C. § 2332g & 18 U.S.C. § 371*

17.    In or about mid-March 2009, in Philadelphia, defendant DANI NEMR TARRAF asked the UC if the UC could acquire missiles or rockets that were capable of shooting down airplanes or helicopters.  Defendant TARRAF clarified that he was looking for a particular kind of rocket that included a compass so that a user could "move it as you wish" [guided missile].

18.    In or about mid-June 2009, in Philadelphia, defendant DANI NEMR TARRAF again asked whether the UC could supply guided missiles.  Defendant TARRAF clarified that the missiles needed to be able to "take down an F-16."  During that visit, in Philadelphia, after discussing the

---

[7]     This point was driven home when a shipment of cellular telephones were temporarily detained by customs officials in Lebanon because DOURI NEMR TARRAF had supplied the UC with deficient information for the airway bill.  This led the UC to remind defendant DOURI NEMR TARRAF, in a telephone call on or about February 28, 2009, that the secrecy of this shipment was important because "the [*expletive*] is stolen."

potential availability of machineguns — specifically, Colt M4 Carbines[8] — and other weapons, defendant TARRAF asked whether the UC could export materials to Syria or Iran for use by "the Resistance." Later on that visit, defendant TARRAF reiterated that he wanted the UC to export approximately 10,000 "commando" machineguns [Colt M4 Carbines with short barrels] to Syria or Iran.

19.     On or about July 28, 2009, defendant DANI NEMR TARRAF again met the UC in Philadelphia, among other things, to pay an initial deposit of approximately $20,000 cash toward the shipping costs for FIM-92 Stinger missiles[9] and approximately 10,000 Colt M4 Carbines. Defendant TARRAF specified that the weapons should be exported to the Port of Latakia in Syria, where he controlled the port and where secrecy was guaranteed because all cameras could be shut down at the port for the shipment. Defendant TARRAF reiterated that no shipping paperwork was required at all once the items reached Syria.

20.     Defendant DANI NEMR TARRAF traveled to Philadelphia on or about November 20, 2009, to inspect the missiles and machineguns to be exported by the UC to the Port of Latakia, Syria.

### *Conspiracy to Commit Passport Fraud - 18 U.S.C. § 371*

21.     Defendants DANI NEMR TARRAF and ALI FADEL YAHFOUFI worked with the UC to obtain a United States passport through fraudulent means.

22.     Defendant ALI FADEL YAHFOUFI, a citizen of Lebanon, served as an assistant to defendant DANI NEMR TARRAF at Power Express S.R.O. During the Slovakia meeting in or about September 2008, defendant YAHFOUFI asked the UC for assistance in obtaining a United States passport in his name. Later, on this same visit, defendant TARRAF stated that he approved of the plan and even agreed to pay for defendant YAHFOUFI's passport. Later, during the same

---

[8]     I am aware that the Colt M4 Carbine is a machinegun manufactured in the United States. The rifle's short barrel, light weight, collapsible stock, and accessory rails make it useful in close-quarter fighting. These rifles are capable of quickly firing a large number of bullets and can be loaded, among other things, with a 90-round circular magazine. Defendant DANI NEMR TARRAF asked the UC to obtain approximately 250 of these circular magazines during the UC's visits to Slovakia in or about September 2008 (in the presence of defendant DOURI NEMR TARRAF) and during his visit to the Philadelphia area in or about mid-March 2009, in light of its application to urban warfare.

[9]     I am aware that the FIM-92 Stinger is a shoulder-fired, heat-seeking, surface-to-air explosive missile manufactured in the United States for military use. The missiles are capable of destroying large aircraft, such as airplanes and helicopters. In a conversation about the Stinger missiles on or about July 31, 2009, defendant DANI NEMR TARRAF told the UC that "if you could get 100 pieces [missiles], they would need it."

visit, defendant YAHFOUFI provided passport photos of himself to the UC for use in his United States passport.

23.    On or about October 7, 2008, defendant ALI FADEL YAHFOUFI sent the UC via fax to Philadelphia an application for a United States passport in which he identified his birthplace as Baalbeck, Lebanon, and listed his social security number (falsely) as "078-586-273" (*nb*— with one extra number in the middle series). The UC called back defendant YAHFOUFI to advise him to list a mailing address in the United States so that, as a citizen, he could obtain a passport. Defendant YAHFOUFI instructed the UC to put whatever false information was required for the application. The UC thereupon listed defendant YAHFOUFI's mailing address 1033 Avenue of the Americas, New York, New York.

24.    In a telephone conversation on or about December 6, 2008, the UC reported to defendant DANI NEMR TARRAF that the paperwork for defendant ALI FADEL YAHFOUFI's United States passport was going smoothly. Defendant TARRAF stated that he would pay for the passport and that "I pay everything for Ali." Defendant TARRAF noted that there were two other people for whom he wanted to obtain United States passports (fraudulently) through the UC.

25.    In or about July 2009, in Philadelphia, the UC displayed to defendant DANI NEMR TARRAF a United States passport in the name of defendant ALI FADEL YAHFOUFI. The UC instructed defendant TARRAF that defendant YAHFOUFI would need to travel to the United States to pick up the passport in person.

## *Conclusion*

26.    Based on the facts set forth above, I submit that there is probable cause to believe that the following defendants have committed violations of the statutes set forth below, and I request that arrest warrants be issued charging that:

a)    from in or about June 2007 through and including in or about November 2009, DANI NEMR TARRAF, DOURI NEMR TARRAF, HASSAN MOHAMAD KOMEIHA, and HUSSEIN ALI ASFOUR, a/k/a "Alex," conspired to transport stolen goods, in violation of Title 18, United States Code, Section 371;

b)    from in or about March 2009 through and including in or about November 2009, DANI NEMR TARRAF conspired to acquire a missile system designed to destroy aircraft, in violation of Title 18, United States Code, Section 2332g;

c)    from in or about March 2009 through and including in or about November 2009, DANI NEMR TARRAF conspired to possess machineguns, in violation of Title 18, United States Code, Section 371; and

-9-

d)      from in or about September 2008 through and including in or about November 2009, DANI NEMR TARRAF and ALI FADEL YAHFOUFI conspired to commit passport fraud, in violation of Title 18, United States Code, Section 371.


SAMUEL SMEMO, JR.
Supervisory Special Agent
Federal Bureau of Investigation


Sworn to and subscribed
before me this 20 day
of November, 2009

HONORABLE TIMOTHY R. RICE
*United States Magistrate Judge*

-10-